**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 24-cr-00361 (TJK)** |
| **v.** | |
| **DERVAL NETTLES,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

On June 15, 2024, Mr. Nettles and his associates converted a residential block of our community into a warzone. Mr. Nettles planned in advance to target certain members of our community by driving into the block and shooting at them with automatic weapons. Mr. Nettles sprayed an alleyway with bullets, ostensibly targeting at least some of a group of seven sitting on a stoop. While he fortunately did not harm anyone, the bullets sprayed through the alley and into homes occupied by individuals he did not even know. His reckless and violent attack was egregious and indefensible. This is not Mr. Nettles' first act of armed violence. He has previously been convicted of an armed robbery after which he attempted to silence the victim in that case. Mr. Nettles' violent conduct must be stifled with a significant sentence of incarceration.

Considering Mr. Nettles egregious conduct in this case, his violent criminal history, and lack of mitigating factors, the Government recommends a sentence of 72 months' incarceration, followed by three years of supervised release.

### BACKGROUND

#### *The Instant Offense*

On Saturday, June 15, 2024, at 2:07 a.m., Metropolitan Police Officer Mohamed Jalloh heard multiple gunshots coming from the rear parking lot of 2730 Langston Place SE, an

apartment complex in Washington, D.C. ShotSpotter reported thirty-four shots in total. Officer Jalloh responded to the area, activated his emergency lights, and saw a white Infiniti Q50 blocking the road and two men running from the vehicle. Officer Jalloh also saw what appeared to be an automatic machine gun under the driver's side door of the Infiniti and another inside the rear passenger seat.

Officer Jalloh canvased the area for potential victims of the shooting and while securing the area, located a man suffering from a gunshot wound lying on the ground on the opposite side of a perimeter fence. Officer Jalloh checked the man for injuries and observed a gunshot wound in the lower abdomen with an exit wound through the lower back.

The man identified himself to Officer Jalloh as Derval Nettles. Nettles stated that he was walking in the area and was shot by unknown individuals.

Law enforcement later obtained surveillance video, which told a different tale. From the video, it is apparent that Nettles, along with three other unidentified men, drove into the apartment complex before opening fire on a group of individuals standing in front of one of the apartment entrances. Around 2:06 a.m., a white Infiniti enters the parking lot of the apartment complex and reverses into a parking space. *See Figure 1.*



*Figure 1*

An individual (Suspect 2) opens the rear driver's side door and looks southeast down the street towards a crowd of people off camera, at one point turning as if in conversation with other individuals in the vehicle. Suspect 2 steps out of the vehicle wielding an AK-style firearm with two hands and opens fire down the street (muzzle flash is visible).[1] *See* Figure 2.



*Figure 2: Suspect 2 firing a firearm.*

Suspect 2 runs southeast down the street still wielding the firearm. As he runs down the street, another individual (Suspect 3) steps out of the same rear driver's side door, also wielding an AK-style firearm with two hands. Then, the front driver's door opened and Suspect 1 (later determined to be Defendant Nettles), wearing all black, exited and ran down the street in the same direction as Suspect 2, also carrying an AK-style firearm with two hands. *See Figure 3.*

---

[1] An apparently unrelated bystander walking by at the time turns to flee at the same time, as captured in the still below with the unrelated bystander blocked out in yellow.



*Figure 3* Defendant Nettles, circled in yellow.

At the same time Defendant Nettles exited, another individual (Suspect 4) wearing dark clothing, light shoes and carrying a firearm exited the front passenger side of the vehicle and ran around the back of the Infiniti in the same direction as Defendant Nettles and Suspects 2 and 3. The Suspects paused where the street intersects with another internal street and appear to briefly communicate and signal to one another. At this time, the white Infiniti, which was apparently left in neutral, rolled forward out of the parking spot and towards the sidewalk, blocking the street. One of the suspects (not Defendant Nettles) ran towards the car. Shortly after, Defendant Nettles (marked with a yellow oval in the still below) ran back toward the vehicle along the sidewalk, still carrying a firearm with two hands. The other suspect stepped out of the driver's seat and entered the rear passenger seat as Defendant Nettles entered the driver's seat.

4



*Figure 4*

After a few seconds, bright muzzle flash is visible from the driver's seat of the vehicle as

Defendant Nettles fired multiple rounds down the street, as shown in the still below. *See Figure 5.*



*Figure 5*

In the video, flashing lights are visible approaching the street from Langston Place SE, as

Officer Jalloh activated his emergency lights. Defendant Nettles then exited the driver's seat with

visibly labored movement. As he exited the car, he tossed an AK-style firearm back towards the

driver's seat, as shown in the still below with a yellow circle around the firearm. The firearm fell

to the ground under the driver's side door. Defendant Nettles hobbled down the street and out of view. *See Figure 6.*



*Figure 6*

The surveillance video reflects that after Nettles and his conspirators opened fire, two of the men at whom they fired retrieved firearms and fired back. *First*, after Nettles and his conspirators opened fire at approximately 2:07:16, a man in a light hooded sweatshirt ran inside the building, but then returned at approximately 2:07:25 carrying a dark backpack. The man walked up the street towards Nettles and at 2:07:31, as reflected in *Figure 7,* removes a machine-gun style firearm from the backpack and points it towards Nettles. At this point, Nettles and his conspirators open fire a second time and the man runs back inside. It is not clear from the video whether this man fired because no muzzle flash is visible.



*Figure 7*

    *Second*, a man in dark clothing with white lettering hides behind a vehicle for approximately thirty seconds after the shooting begins, before running down the street away from Nettles and firing at least one shot over his shoulder.

*Figure 8*



The surveillance video also reflects that only one person (Nettles) was injured during the gunfire.

Three firearms in total were recovered from the crime scene. *First*, a black Micro Draco ROA-21 was recovered on the ground next to the driver's side door of the Infiniti. Based on ballistics and DNA analysis, this was the firearm that Nettles used to fire into the crowd on the stoop. *Second*, an AM-15 firearm was recovered from the rear passenger seat of the white Infinti. This firearm was apparently used by one of the other suspects who was in the vehicle with Nettles.  *Third*, a tan Glock 19X loaded with one round in the chamber, and thirty rounds in a thirty-one round magazine was recovered in the bushes. Notably, the gun was covered in blood. The surveillance video reflects that Nettles briefly paused in front of these bushes and makes movements consistent with an individual removing an object from their waistline. Subsequent

DNA analysis also connected Nettles to this firearm.

### *The Pre-Sentence Report*

The Pre-Sentencing Investigation Report (PSIR) in this matter summarizes Mr. Nettles' history.

Mr. Nettles was born and raised in Washington, D.C. PSIR at ¶ 53. Mr. Nettles described his childhood as "normal" and "fair." PSIR at ¶ 58. He was provided with all necessities and denied being neglected or abused. *Id.* At various times, he lived primarily with his mother, then his father, and afterwards with his older sister. PSIR at ¶ 59. Mr. Nettles attended D.C. public and charter schools but struggled with reading and math. PSIR at ¶ 74. He was briefly sent to boot camp because of absenteeism. PSIR at ¶ 74. He ultimately graduated high school. PSIR at ¶ 74. Mr. Nettles was briefly employed with the D.C. Department of Public Works in refuse collection. PSIR at ¶ 78. He was previously employed as a forklift operator. PSIR at ¶ 80. Mr. Nettles has one child. PSIR at ¶ 60. Mr. Nettles was seriously injured during the instant offense. PSIR at ¶ 66.

### *The Applicable Guidelines Range*

The PSIR estimates a total offense level for Count 1 (Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1)) of 21, a criminal history category of II, and a resulting Guidelines range of 41 to 51 months' incarceration. PSIR at ¶¶ 92-94. With respect to Count 2 (Assault with Intent to Kill, in violation of 22 D.C. Code § 401), the PSIR estimates this offense to be Group 5, and a criminal history category C, resulting in a Guidelines range of 60 to 108 months' incarceration, 24 months of which is mandatory. *Id.* The PSIR also estimates terms of supervised release of one to three years for Count 1. PSIR at ¶ 98. The Government agrees with

these calculations.

### ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> > > (i) issued by the Sentencing Commission . . .;

and
(ii) that, . . . are in effect on the date
the defendant is sentenced; . . .

    (5) any pertinent policy statement –
        (A) issued by the Sentencing Commission . . . and
        (B) that, . . . is in effect on the date the defendant is
        sentenced.

    (6) the need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty of
similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions.").

And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate

11

sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The Government recommends that the Court sentence Mr. Nettles to 72 months of imprisonment, followed by three years of supervised release. This sentence provides a significant penalty to Mr. Nettles, commiserate with the egregious nature of his violent offense and the danger he poses to the community, as well as a significant deterrent to those who might imitate his crimes.

I.    **The Nature and Circumstances of Mr. Nettles' Offense.**

The Langston Lane apartments in the Woodland Terrace are a row of apartment buildings occupied by members of our community, including families with children. On June 15, 2024, Mr. Nettles turned that area into a warzone.

Mr. Nettles and three others coordinated an indiscriminate attack on members of our community who were sitting outside on a stoop. These men armed themselves with automatic weapons and traveled to Langston Lane. Without warning or cause, they then opened fire on these individuals. Bullets flew across the alleyway, many entering the windows of the occupied apartment buildings along Langston Lane. Mr. Nettles' apparent target was a group of approximately seven people including women, and men, of various ages. But Nettles and his associates indiscriminately sprayed into the alleyway. It is extraordinarily fortuitous that only Mr. Nettles was injured. And Mr. Nettles only stopped firing when he had been shot.

This was an attempted mass murder and is deserving of a significant period of incarceration.

II.     **Mr. Nettles' History and Characteristics.**

Mr. Nettles history and characteristics also justifies a significant term of incarceration.

While Mr. Nettles does not have a particularly lengthy criminal history, it is serious.   Mr. Nettles previously committed a serious armed assault and then attempted to dissuade his victim from testifying against him.

On October 7, 2013, Nettles and others showed up outside of a victim's home and attempted to convince the victim to come outside. The victim refused but another individual inside let Nettles enter. Once inside, Nettles and two others then assaulted the victim, went through her pockets, and removed her shoes. Nettles and the others then pinned the victim to ground. The victim struggled during this assault. In response, one of Mr. Nettles' accomplices then pulled out a gun and fired it near the victim's head.

Mr. Nettles was subsequently charged. While detained pending trial, Nettles attempted multiple times to get others to contact the victim. Mr. Nettles specifically tried the get the victim to change her testimony or prevent her from testifying at all. Nettles instructed others to "make sure that bitch shut that shit completely up," "hold it all the way, bitch you had that demonstration," "go holler at her . . . tell shorty I'll pay her or anything. . . . But holler at her mo. . . but do that for me though." Mr. Nettles subsequently pled guilty to the robbery, associated firearm charge, and obstruction of justice.

For this serious crime, despite his lack of prior criminal history, Mr. Nettles was sentenced to a significant term of imprisonment, followed by supervised release.   Undeterred, less than seven months after his probation expired, Mr. Nettles engaged in the egregious shooting on June 15, 2024.

There is little in Mr. Nettles' past that seems to explain or even mitigate his conduct. He self-reported having a positive upbringing and he is a high school graduate. Nonetheless, Mr. Nettles has had sporadic employment. That he had academic struggles as a youth seems to have no bearing on the extraordinarily violent and premediated conduct in which he engaged.

Mr. Nettles' history and characteristics does not mitigate his conduct and instead justifies a significant term of imprisonment.

### III.    The Need for the Sentence Imposed.

A significant term of incarceration for Mr. Nettles will further the goals of sentencing. Mr. Nettles appears to have been involved in a back-and-forth of retaliatory shootings in a neighborhood that has been plagued by gun violence. Nettles did not seek to rob anyone to fulfill any pecuniary need. Instead, he was settling some petty grievance with others using an automatic weapon and spraying indiscriminately into a crowd. All seven individuals in that crowd indisputably did nothing to invite that kind of violence. And certainly, the other members of our community, some of whom had small children, did nothing to deserve having Mr. Nettles' bullets fly through their windows and into their walls.

This type of reckless armed violence must be deterred. A significant sentence will ensure that Mr. Nettles—who apparently has not learned from shorter terms of incarceration—will not present a danger to our community for some time. It will also provide general deterrence. Nettles, his associates, and even some of his intended targets must be made aware that this type of reckless shooting has no place in our community. This Court should make it clear that if you engage in these back-and-forth retaliatory shootings you will go to jail for a significant period.  Finally, a significant term of imprisonment will provide a structured environment for Mr. Nettles to reflect

on his offenses, enroll in needed vocational training, and hopefully contribute to society upon his return.

Mr. Nettles is no longer a young man. He is thirty-three. While it would never excuse this conduct, a younger man might have the excuse of youthful passion or poor judgment. That is not Mr. Nettles. He has previously been incarcerated and on supervision for a violent crime. A significant term of incarceration is required to deter Mr. Nettles and safeguard our community from him and others who might follow from his example.

## CONCLUSION

For all the foregoing reasons, the Government requests that the Court sentence Mr. Nettles to seventy-two months of imprisonment, followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
United States Attorney's Office
601 D. Street, NW
Washington, DC 20579
202-258-3515
Cameron.Tepfer@usdoj.gov